I know they say we're not supposed to ask you a question for three minutes, but I think we're all familiar with the facts and we've read the briefs. I have a fundamental question. Given that Judge Tilburg has dismissed the underlying complaint in the MERS-related appeal here, should the appeal from the order denying a preliminary injunction be dismissed as moot? He has – the short answer, in our view, is no, Your Honor, it should not. Because he – in the order that we submitted with a request for judicial notice where he dismisses, he has basically said you can file a motion for leave to file a consolidated amended master complaint. And – but he also says that if you have a case where a preliminary injunction is needed, then you file a separate complaint. And so – But he kicked the court – he kicked that complaint out, right? So I guess if – what you're saying, if it's not moot, how could this court grant effective relief if it were to conclude that the district court abused its discretion by denying the preliminary injunction? There's no complaint. Well, there is a complaint in Tucson on the TILA-NFHA claims that has not been dismissed. So – because we – as we explained – I asked about the MERS-related appeal. Related to the MERS issue, we would propose that the relief be fashioned such that the denial of the preliminary injunction was improper and that it should be reversed and remanded with instructions to allow the filing of the complaint to support the MERS claims for the preliminary injunction. But there's no complaint – there's no case before Judge Teelborg with regard to Ms. Silvas now, is there? We would have to – no, there's not. We would have to comply with his order the way he drafted it in the NBL case. So I think the answer to Judge Callahan's question is it is moot as to Judge Teelborg's ruling on her first request for a preliminary injunction, but you would still urge us to reverse Judge Roll's denial of your second request for a preliminary injunctive relief. Is that – would you accept that as sort of a friendly amendment of your position? Yes, Your Honor. Okay. All right. Why don't we – unless Judge Callahan has further questions on Judge Teelborg, really, why don't we turn then to the Judge Roll's rulings in Tucson? Yes. The ruling in Tucson followed the Teelborg ruling, and he followed Judge Teelborg's finding that because there was inequitable conduct or unclean hands that Mrs. Silvas was not entitled to seek relief. And the Court confused or misapplied the doctrine of unclean hands versus he who seeks equity must do equity. And the unclean hands doctrine acts as a total bar, but the he who seeks equity must do equity does not act as a total bar. And the Court has to look at the material facts affecting the equities between the party and looking at how each party transgressed, for lack of a better word. In our case, there are facts related to transgressions related to the part of Countrywide related to Mrs. Silvas in terms of how the loan was sold to Mrs. Silvas based on the fact that there were TILA violations. On the face of the TILA statement basically says a 2 percent interest rate when she was charged a 7 percent interest rate. She was promised a loan that is a 2 percent teaser rate for three years, and then also promised that when she expressed concern over the adjustable rate nature of that loan, that don't worry, you'll be able to refinance it before it goes higher. Didn't happen. And so she, but she did attempt to modify the loan. She attempted to keep up with the payments. And when you look at her attempts, and she can bring taxes and insurance current on the property, and there could be relief action in a preliminary injunction. Well, but the problem is none of us can just pay taxes and insurance on our property to ensure that we get to stay there. I was getting to that. Okay. That relief could be fashioned where if she either has to post some sort of a bond or that she makes a higher payment on top of the taxes and insurance toward the payment of the note, which is still our position. So this would be almost in the nature of a bankruptcy cram down that the court would order the lender to modify the terms of the loan to accept less than what it has a contractual right to receive? Is that what you're asking us to do? I'm not necessarily familiar with bankruptcy cram downs, but it's a proposed methodology of balancing the equities between the parties. Well, I guess it's an intriguing thought, and I don't necessarily know the answer off the top of my head, but you are here before us arguing that the district court abused its discretion in not enjoining the foreclosure of Ms. Silva's property. And the question is, is she likely to prevail on the merits of her TILA claim, right? That's how you frame the issue for us. TILA claim, and then she also had Fair Housing Act claims. Fair Housing Act, yeah. Arizona Consumer Fraud Act. The non-MERS claims, how's that? Correct. Okay. And, again, you get into the doctrine of equitable tolling and whether or not equitable tolling is supported in this instance. And what facts do you have as to Ms. Silva to support equitable tolling that are different from what we talked about with regard to Ms. Cervantes in the last case? She actually had a loan audit done to reveal the nature of the TILA violations. And what did that do for her? That basically indicated that there were improper disclosures of the interest rate and caused her to proceed with the loss or joining into the litigation. So in terms of application of the winter factors of likelihood of prevailing on the merits, you don't have to show a 100 percent likelihood to warrant the granting of the preliminary injunction. The court also looks at the likelihood of irreparable harm. And in her case, she has a house that she's lived in for over 20 years. She has no place else to go. She testified to that in front of Judge Chilberg. But why aren't money damages an adequate remedy? It seems to me that if she prevails on the TILA claim, she may very well be entitled to make out damages for the misrepresentation that resulted in harm to her credit rating, you know, perhaps other financial damages. But you're asking us to allow her to remain in the residence, notwithstanding her obligation to repay at least the principal amount of the loan, right? Well, that's related to, again, the wrongful foreclosure aspect of the case. And it's difficult because the cases have been split. But you're asking us to balance equities. And it struck me in reading Judge Rohl's and Judge Tilberg's orders in this case that both of them were influenced by the fact that she hadn't made her payments, she hadn't tendered a repayment of the loan because she doesn't have the money, yet she wanted an injunction to allow her to remain living in the house while she litigates her TILA claim against the lender and all these other parties that you've named in the lawsuit. And as I read the court's order, what they were saying is, that doesn't sound equitable to us because it basically gives her everything and the other side nothing. And, you know, her hands are not totally clean here either. Have I missed something? Is that basically what the district courts were saying? In a nutshell, yes, Your Honor. But they missed the point that in a TILA rescission claim, you don't have to tender the proceeds or the loan balance at the preliminary injunction site. Well, okay. I know that. What is your factual basis for her right to rescind? What specific information did the defendants fail to provide that triggered her right to rescind? They failed to provide her with the three-day notice of the right to rescind her loan. And there are other TILA violations that I've already covered in terms of the interest rate disclosure. All right. Would her rescission claim allow her to keep possession of her home if she ultimately prevailed on the merits? I think once you get to the rescission point, if she can't ‑‑ So if she's granted rescission, what payments does she have to make to the defendants? What payments would she have to return to the defendants? I mean, it can't be that she gets to live there for free all that time. No, she doesn't get to live there for free, but I think that you would have to exercise some sort of reformation of the contract. I think you have to balance also the fact that she's making the claim that the loan is not secured and that foreclosure is inappropriate and that you have to, once you get past the initial ‑‑ I mean, when you get to the end of the case and you're deciding the merits and electing the remedies, that there would be some sort of offset there. Well, it seems that she can't afford to live there. Now, I guess, but is it relevant for purposes of a preliminary injunction whether the syllabus could afford to ‑‑ could afford the payments she would have to make to the defendants if she prevailed on her rescission claim? I don't know of any case law that indicates that that is a relevant area of inquiry. Well, if she can't pay the money back and she gets to keep the property that secured the obligation under the loan and she gets the damages that she's seeking for the harm to her credit rating and so on, it seems an odd result that she gets to keep it all and has no obligation to repay any of it. Well, it's not that she can't afford to make any payment. It's the fact that she can't afford to make the inflated payment that was improperly disclosed to her. Well, as I understand it, her annual income at the time of the loan was at what, about $20,000 or $25,000 a year? And she took out a, what was it, $257,000 loan? She had other ‑‑ well, she had other areas of income that have changed since then. But that's not in the record, right? You know that because you represent her, but we don't know that from looking at the record. No, it's not, Your Honor. Okay. But going back to the winner factors and the irreparable harm aspect, there are cases that say that even though there are monetary damages when it comes to looking at the loss of one's primary residence, that irreparable harm can be found. But the irreparable harm under the winner factor is if we don't enter this injunction to stop the sale of the property, there is no way that any other form of relief, i.e., money, could ever compensate the plaintiff. And therefore, we must stop the foreclosure. Isn't that the analysis under irreparable harm? As to whether or not monetary damages could have ‑‑ Are sufficient. Correct. And I'm having a hard time understanding why a large enough amount of money, assuming she prevails on the TILA claim, wouldn't compensate her for all the harm that she allegedly suffered. Well, in terms of the ‑‑ whether or not monetary damages could compensate her, the value of one's home can't necessarily be defined in money. Well, what she wouldn't get if they sell the home is she wouldn't be able to live there for free while this litigation is going on. But is that something that we can say she has a right to live there for free while this is going on? She's not asking to live there for free while this is going on. But the only thing I see in the record is I can pay ‑‑ I can afford to pay the taxes and insurance on the property. Correct. Okay. So that takes care of the tax collector and it takes care of the insurer, but it doesn't give anything to the borrower who loaned her almost $250,000. Well, in terms of the borrower or the lender who lent her the money, it's our position that it's not our position that they're not owed any money. It's our position that they should not be able to foreclose because they're not a proper party to foreclose based on the whole Murr's assignment issue, which was discussed as part of the Cervantes case and which is included as part of the ‑‑ Well, the Murr's issue is now out of her case because that got dismissed. So now we're looking at this solely from whether or not the district court abused its discretion in Tucson when it denied her second request for an injunction on the basis of the remaining claims. So we can't look at the Murr's claims in order to assess abuse of discretion or to apply the winter factors. Campbell? Correct. But the court in Tucson didn't even get to the irreparable harm analysis or whether or not she's seeking to live in the house for free or anything like that. They never got beyond likelihood of success on the merits. They denied the equitable tolling issues. And they didn't necessarily ‑‑ they never even got to the point of balancing the equities between the parties or looking at the public interest of keeping people in their houses versus letting the bank come in and take the property without showing that they have the right to take the property. Okay. I think we understand your position, and I'd let you run over a couple minutes. Thank you. You're welcome. And I meant to save some time for Rebecca. I'll let you have the last word. Okay. Okay. All right. Let's see. Mr. Heffron, you're up again. Up again. All right. It pleases the court. Let me talk about the equitable part first. Well, why didn't you tell us that it was moot? Oh, whether it's moot? Yeah. The part that ‑‑ Why did I have to ask that question? Judge Halborg's order. Well, at the time we did, when we initially did the brief ‑‑ It's Tealborg, by the way. Tealborg, I'm sorry. When we initially did the brief, I believe it wasn't, but ‑‑ Yeah, but that's what ‑‑ that's why you can send a letter to the court. Sure. Your Honor, the issue, I guess, is, and I had some question in my mind about whether, although the case was dismissed, the court did not enter with prejudice, did not enter judgment. Therefore, the court continues, does continue to have jurisdiction. So we're making a better argument for you than you thought you could make? No, Your Honor. Do you want to talk me out of that? No, I don't want to talk you out of it. I don't want to talk you out of it. But I was concerned because Judge Tealborg has issued an order that was not dispositive, finally, of that part of the case. But it would still be a new complaint if it came back. It wouldn't be the complaint that we're looking at, right? It would be an amended complaint, that's right, if the judge even allows the amended complaint. All right. Well, I guess it's good that we have, like, really good law clerks and good judges, right? Yes, Your Honor. Go ahead. On the equity issue, the facts were undisputed, and I just wanted to bring Your Honor's attention particularly to an exchange at the hearing because the idea that Ms. Edwards pointed out that perhaps Judge, either Judge Rall or Judge Tealborg should have fashioned relief, I think is disposed of by what actually happened at the hearing. And I don't have the record, it's up on my record site, but on page 24 of the transcript of the preliminary injunction hearing and line 19, the judge asked the question, I was asking whether the result would be that you seek is that she would keep the house without bringing a rearage as current and without making payments in principle and interest. And Ms. Edwards answered, yes, Your Honor, that's correct. I think she told us that here. The only thing she can afford to pay are taxes. Taxes and insurance. And she also opposed the bond. I don't see how she could qualify for a bond based on her financial situation. Well, and I don't know if she opposed it. She could post the house. Or perhaps she could post perhaps a friend or a relative or whatever. But in any event, there was no equitable offer made, and that was the difficulty I think that the courts faced and the reason they concluded that there was an attempt or a request to seek equity without doing equity. And as a consequence, both judges, and particularly Judge Roll, acted within their discretion in denying relief. There is a further question that was raised, I think, Judge Callahan, on the question of truth in lending and what the remedy would be on rescission. Well, on rescission, if the rescission claim was valid, the remedy is that Ms. Silvis has to tender back to the lender the principal that she obtained as part of the loan. And so if it would seem to our position, as it would seem to us, that at a minimum if she has a truth in lending rescission claim, she should have at least agreed to tender whatever monthly principal payments were coming due. Because that money, even if she wins on rescission, has to go back to the lender. And obviously, if she's still in relatively early stage in the loan, that would have been probably a pretty modest amount. We all know the principal's interest is front-loaded, principal's back-loaded. But she made no offer. Whatever it might have been, $30 or $80, I don't know what it was. But that would be the remedy. So even if you look at the most significant of the claims, which is the rescission claim, there was at least something that she still would have had to perform on her part, and she did not even make that offer. And so, therefore, the courts acted properly, we contend, in concluding as an independent ground that this was not an equitable request, and therefore the injunction should be denied. With respect to Judge Roll's ruling, which were limited to the truth in lending and the Fair Housing Act claims, I think we already trod through the issues on the truth in lending statute of limitations. The way these cases were pled out by Ms. Edwards and her colleagues is the Robinson and Cervantes cases in relevant respects are essentially identical. So the allegations with respect to tolling on truth in lending in both cases are the same. Well, I guess Judge Roll really didn't get to the equitable tolling, though, right? He talked about equitable estoppel. That's correct. So did the service establish grounds for equitable tolling or estoppel based on the fact that she was unable to review the loan documents in English and relied on the closing agent's alleged representations as to the content of the loan documents? She did not. What she put an affidavit in and what she didn't testify about it, but on her affidavit what she said was that she entered into the loan and several months after I entered into the loan, I discovered my loan payments had quickly escalated and continued to escalate with an increased interest rate. So her testimony at the injunction hearing through the affidavit was that several months after, she discovered that there was a problem. And then what she said was once I learned that and waited until the one-year prepayment penalty was over, I then approached Countrywide to talk about a refinance. And so by definition, at least as I read, I think a fair reading of the testimony, is that she discovered within the year, the truth in lending year, that there was a potential problem. And there's no allegation she didn't offer an affidavit or testimony that she did anything to have somebody take a look at the documents she had signed and translate them for her and explain, gee, you know, maybe find out whether in fact she didn't sign a document that allowed this escalation. Or if she did, that maybe there was in fact a misrepresentation. She did not assert that there was any, that she, beyond the complaint obviously because it's a hearing, she did not assert that she exercised any diligence whatsoever, recognizing that she is not fluent in English and cannot read English and recognizing that she is paying a lot more money as she testified that she thought she was going to need to. And so I think this is an even stronger record than Cervantes, which is simply on the complaint, because she testified about what actually happened and she admitted that it was within the year and she didn't exercise diligence. And so on the record, she did not demonstrate that tolling. So her affidavit would somewhat limit what she could say at this point. I think that's right. I think that's right. And those proceedings were in front of Judge Rohl. Remember, the pattern here is everything was filed before Judge Rohl, but it had to do with MERS, and so it went back to Judge Theoborg. Judge Theoborg rolled on the MERS and then it came back over to Judge Rohl to roll on the other substantive allegations. Obviously, Judge Rohl took view of the transcript and in fact relied upon the opinion. And certainly I think that the failure to speak Spanish is not enough, to be able to be fluent in English, I guess I should say, is not enough because the due diligence requirement is still a requirement of equitable tolling. Well, if we were to say that the fact that they didn't speak English and that that would be sufficient for equitable tolling, what would be the effect on the industry generally? What if we did that in a published opinion? A couple of things. The truth of lending does not in fact require that things be translated into one's second language or first language, I should say primary language. And as Ms. Edwards points out, some states actually have such a requirement. In some respects, some don't. California has a requirement that if the transaction is negotiated not in English, then the documents have to be translated in English. I think that's a fair characterization statute I have in front of me. Arizona doesn't say that. What would be the result would be presumably it would require significant expense and significant effort. There would be questions, of course, about what does it mean to not be able to transact in the language. What do you do with someone who has halting experience or halting capability? Well, it would seem that there would always be a factual dispute there. About whether? Whether they needed a translator, whether they needed the documents in English or not. Sure. And one of the things that happens, of course, is that truth of lending, for example, requires that certain disclosures be given to everyone. So federal judges have to get the same disclosures as Ms. Hilva's got, partly because it's better, it's easier, it makes sure everybody has a level playing field and makes sure that there's no disputes about whether you deserve the disclosures versus someone else deserves the disclosures. It would be difficult. I presume what might happen is the lenders might offer a suite of documents in various languages. And I hesitate. I don't know how far that goes, what happens if someone is fluent in a language that not very many people are fluent in. I don't know where that would be. Presumably that's something the Federal Reserve, with its authority over truth of lending, can address if it deems appropriate. Regarding the Fair Housing Act, we didn't touch on that. We just touched briefly on that issue. The statute of limitations issue was present there, although it was a two-year statute, not one. Plaintiffs claimed there was a continuing violation, and the Fair Housing Act does allow tolling in the event of a continuing violation. That comes out of the Havens case in the Supreme Court. And I'll just talk briefly about the Havens case so we can clear up any question about whether there's a continuing violation issue. In Havens, which was a fair housing organization and some fair housing testers, people applied for loans, and the court considered what would be an appropriate way to judge the statute of limitations when you had a claim by the people who applied for loans and didn't get the loans and a claim by the organization and some of its members that the conduct of the lender was leading to a nondiverse community. And the Supreme Court said those people who applied for a loan didn't get it, their claim accrued when they made the loan, when they went in there, didn't get the loan, and the statute starts right at that point. Continuing violation, however, applies when you've got a theory that the individuals who are members of this organization and the organization believe that they have a right to a diverse community. And that's obviously a diverse community, because that's obviously a claim that continues day after day. If the lender is doing something and preventing African-Americans from applying, for example, for loans, then that would have a continuing effect every day of leading to a nondiverse community. That's a continuing violation. We don't have that here. We have the other claim that was in Havens, which is someone who applied for a loan, and the allegation is that she didn't get it or she didn't get good terms because she was Hispanic. That liability, if there is one, and we can test it, accrues at the time the loan is made. We also did point out that there are certainly other grounds on which these claims could have been disposed of in our favor, and as Judge Rohl didn't reach those points because he went off on the staff limitations, but most generally speaking, these claims were pled very loosely, no specifics, and didn't give Judge Rohl really any basis for believing that there was a likelihood that there was going to be a claim to be made. In light of that, Judge Rohl's ruling was appropriate and certainly well within his discretion. This is a discretionary decision, and the plaintiffs haven't shown that Judge Rohl acted inappropriately. With respect to the MERS claims, obviously the panel seems inclined to find that those claims are moot. In light of the absence of an operative complaint, I would just add two very brief points on the issue, in case the panel reconsiders upon deliberation. One is this was characterized by the plaintiffs as a dispute about whether MERS can foreclose on Ms. Silvas. As we point out, however, in our briefs in page 31 to 32, the foreclosure at issue in 2010 was not done by MERS. It was done by the noteholder, Bank of New York, and the trustee was appointed by the noteholder, Bank of New York. So her complaints have to do with what happened in 2008, which was a foreclosure that was canceled. In 2010, the one at issue involves the noteholder. There's no dispute with the noteholder. The noteholder appointed the trustee. And so all these issues about MERS really don't apply to this particular instance. The other issue, again, we do talk certainly in the briefs, as well as this issue was in Cervantes, talk about whether this idea that somehow, as Mr. Nebiger said, things have changed and the mortgage and the note are split. I would just encourage the panel, as I know the panel will if it gets to that point in this case, to look again at the deed of trust. Ms. Silvas' deed of trust is in the record. It was attached to her affidavit that was before both judges. And I think the Court will find that things have not changed the way the plaintiffs contend. The intention, obviously, at the time of the loan is still to secure repayment. The document specifically secures repayment to the lender of the sums that were extended by the lender. And that's the exact language in the document. It secures repayment in favor of the assinees of the lender. Now, state law authorizes certain parties to act. And generally in the nonjudicial foreclosure context, state law allows a form of self-help, which allows the parties, in this case Ms. Silvas and Countrywide, to contract as to how nonjudicial foreclosure procedures will go forward. And the parties did that. And the document shows that MERS has authority to act in the place of the lender. It also shows that the lender has certain authority. And it shows the trustee his authority. Those may be the introduction of MERS may have led things to be somewhat different. But it doesn't change the fundamental reality that the loan is secured. It is secured in favor of the lender. And that nonjudicial foreclosure procedures in Arizona permit certain parties to foreclose and permit the parties by contract to give out certain powers. And the contract does enforce the authority of MERS to act and the authority of the lender to act and the authority of the trustee to act. And, you know, the other cases that plan, and I'll finish on this, the other cases that plan to cite, I think we have submitted supplemental responses and supplemental authority, not yet on the Agard case because it was just submitted, but we will. But I think it's fair to say, if I had to sum up in ten seconds what they mean, I think at best, and there are many, many, many cases out there, at best the few additional cases that have been offered to the court show that some courts are sorting out certain state law questions based upon the records before them. Sometimes the record isn't perfect. Sometimes the facts aren't exactly as they might be in this case. And the issues here, which have been briefed, relate to particularly this case, what actually happened with the Silvis and under Arizona law and this deed of trust. And so we just urge the court that, I mean, as we move forward in this case, and certainly also in Cervantes, the issues aren't governed by, you know, obviously a decision out in New York Bankruptcy Court or by Massachusetts Supreme Court. The issues really, I think, are much more local than that, and I think fully supported in Judge Roll's opinion and Judge Stilburg's opinion, both fully supported in the record. Thank you. Thank you very much. Edwards. Oh, I'm sorry, Mr. Neveger. All right. I will give you two minutes on rebuttal. Oh, I need your honor. Thank you. As Mr. Heffernan points out, as more and more courts start looking at these issues with MERS and how MERS works and what authorities MERS has and whether they're agents or whether they're nominees, things of that nature, they, at least in our opinion, have come to conclusions that something has changed and that the traditional notion of how deeds of trust work have changed. And in that regard, I would submit that I was involved in a case that was before the Ninth Circuit involving how American pipe works in class actions. And this court, not necessarily this panel, but this court certified that issue to the Arizona Supreme Court to ask them how they would interpret the American pipe tolling issue on class actions. So I'm not sure exactly are you asking us to certify wrongful foreclosure? I think that would make a lot of sense under the facts of this case, too, because we're coming before you debating what Arizona law is and what Arizona law would do. And there just really isn't anything other than a 1934 Favor v. Hill case that even deals with the issue of splitting the note and whether the note goes, mortgage goes with the note and things of that nature. To me, that would make a lot of sense. Because, I mean, it's not. So, specifically, what are you asking us to certify? Well, I think we could. Whether there's a wrongful foreclosure, whether you can state a claim for that? Right. I mean, you've asked what the elements are, and I think, quite frankly, the elements are someone without authority taking your house under a deed of trust. We could certainly sit down with the defendants and perhaps craft a question to be certified to the Supreme Court if the court wishes us to try to do that. But, I mean, in terms of how things have changed, we've got Mr. Heffernan up here arguing on behalf of Countrywide, the original loaner of money to Mrs. Silvas, when, in fact, Countrywide has already been repaid. I mean, Countrywide loaned money. And the Supreme Court simply ducked the question by saying, there's nothing in the statute that says there's a claim for wrongful foreclosure, and it's up to the legislature to tell us whether such a claim exists. Well, under the scheme, the statutory scheme, it defines beneficiary. And a beneficiary is a very limited, has a very limited definition in the state of Arizona. But that's not your, essentially, then you're just asking us to certify the whole case and say, do you think we're right? No. I mean, generally what you do is you, if it's a state law issue, you say, what's your law? If you have any question, and so. Well, the issue is we're dealing with Arizona real property law. And I think everyone would agree that Arizona has an interest in how the nonjudicial foreclosures work in the state. But let's assume that Mr. Heffron was right, and that because this is a nonjudicial foreclosure, Arizona permits parties by contract to establish certain duties and obligations of the beneficiary, which Arizona would recognize. I'm not sure how certifying this question to the state court, frankly, would help us much, because it's an intensely factual question related to the terms of the underlying deed of trust contract itself. Well, but I think the facts, such as this case and the previous case that we argued, deal with the definition of what is a beneficiary, and is MERS a beneficiary under the deed of trust? Well, I don't think that we have a MERS claim at this point with regard to Ms. Silvas. So if that was an argument that you meant to make in the Cervantes case, you missed the train on that one. Well, but, again, Mr. Heffron sort of pointed out, I think, our position is that Judge Teelburg has dismissed the case, but he hasn't made that a final order, and he has given us opportunity. So, theoretically, Mrs. Silvas is still before him. We just don't know in what capacity. Well, we'll have to think about this, and obviously we'll chat about it in conference. But if you both are right, then I question whether we might have appellate jurisdiction, because there isn't a final order of the district court that is now in front of us, is there? Well, not with respect to the dismissal. Yeah, that's what I'm saying. I'm not talking about the Judge Roll portion of the case. Right. We've been in a dilemma, because as he dismisses cases, we're just more of them. Okay, Mr. Devereux, I think we understand. I've given you both sides plenty of time. Thank you very much for your arguments. The case just argued is submitted, and we'll give you an answer as soon as we can figure this all out. Thank you for the time. Thank you. All rise.
judges: Thompson, Tallman, Callahan